Bruce G. MacIntyre, WA Bar No. 18984
BMacIntyre@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
*Pro hac vice*

Edward Wes, CA Bar No. 78551
EdWes@perkinscoie.com
Gabriel Liao, Bar No. 205897
GLiao@perkinscoie.com
PERKINS COIE LLP
101 Jefferson Drive
Menlo Park, CA 94025-1114
Telephone: 650.838.4300
Facsimile: 650.838.4350

Attorneys for Debtor and Debtor-in-Possession
Tripath Technology, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>TRIPATH TECHNOLOGY, INC.,<br><br>Debtor. | CASE NO. 07-50358 (MM)<br><br>Chapter: 11<br><br>Date: May 3, 2007<br>Time: 2:00 p.m.<br>Place: United States Courthouse<br>280 South First Street<br>San Jose, California<br>Judge: Morgan<br>Courtroom: 3070 |

**MOTION TO PAY PERFORMANCE-BASED INCENTIVE COMPENSATION**

Tripath Technology, Inc. ("Tripath" or "Debtor"), the Debtor and Debtor-in-Possession in this case, hereby moves the Court (the "Motion") for the entry of an order authorizing the Debtor to pay performance based incentive compensation to its remaining employees upon completion of

MOTION FOR ORDER APPROVING
PERFORMANCE-BASED BONUS]       -1-
99999-8613/LEGAL13151065.1

the auction set for May 3, 2007 to sell substantially all of the Debtor's assets. In support of this Motion, the Debtor represents as follows.

## Jurisdiction

1. The Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicate for the relief requested herein is sections 363 and 365 of the Bankruptcy Code.

## Relief Requested

4. Debtor is in the process of winding down its business and liquidating its assts, with an auction and sale hearing (the "Auction") set for May 3, 2007. In the meantime, however, Debtor's business operations are being finance by ordinary course sales of its products ("Sales"), pursuant to an agreed budget (the "Budget") approved in conjunction with obtaining authorization to use cash collateral pursuant to 11 U.S.C. §363(c)(2). In order to maximize both ongoing Sales and the proceeds from the Auction, the Debtor proposes that it be allowed to offer incentives to its remaining employees in the form of performance-based bonuses *if* Sales or Auction proceeds meet or exceed specified levels.

5. The Debtor proposes to establish two incentive "pools;" one consisting of 15% of the gross profit from Sales in excess of the Budget, and the other consisting of 5% of the Auction proceeds received in excess of the Secured Parties' allowed claim.[1] The majority of the incentive payments (75%) would go to the two employees who will be most pivotal to the success of the post-petition Sales effort and the Auction. However, because no one or two individuals are ever 100% responsible for the success of an effort of this type, 25% of the incentive payments would be shared equally among the Debtor's other remaining employees on a *pro rata* basis.

---

[1] The "Secured Parties" (as defined below) have submitted a proof of claim seeking in excess of $4.8 million, plus additional interest and fees as allowed by the parties' prepetition financing agreement. To the extent the Court ultimately allows their claim at a greater or lesser amount, this allowed claim would dictate the base line for a bonus based on Auction results.

MOTION FOR ORDER APPROVING
PERFORMANCE-BASED BONUS -2-
99999-8613/LEGAL13151065.1
Case: 07-50358 Doc# 128 Filed: 04/19/07 Entered: 04/19/07 15:58:26 Page 2 of 11

6. Debtor is authorized to represent to the Court that the Secured Parties do not oppose the relief sought.[2] Moreover, although the Secured Parties have not yet consented to the payment of any incentives if the Auction proceeds that are less than or equal to the amount of their allowed claim, the Secured Parties have agreed to give consideration to such payments.

**Background**

7. Tripath filed a voluntary chapter 11 petition on February 8, 2007 (the "Petition Date"). Tripath remains a debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code (the "Code"). No trustee has been requested or appointed in this case and, to date, no official committee of unsecured creditors ("Committee") has been appointed.

8. Tripath was founded in 1995 by Dr. Adya Tripathi as a fabless semiconductor company focusing on power amplification for the digital media and electronics markets. Tripath owns approximately 100 patents, including a patented technology that combines modern advances in digital signal processing and power processing. Tripath products are used in a wide range of markets, including home, computer and automotive audio systems, wide-screen television, high-speed networking and wireless communication. Tripath also provides technology for use in DSL line drivers that allow service providers to increase the number, reach and signal speed of subscriber lines without modification to existing infrastructure. Implementation of Tripath's Digital Power Processing techniques in the RF power amplifier arena also is projected to yield longer battery life and longer talk time for cellular phone users.

9. From a previous high of approximately 200 employees, the Debtor has reduced its work force to nine employees working a mix of full and part-time schedules as needed. Two of these employees are particularly vital to the remaining business of Tripath.

10. Vijay Thairani, the Vice-President of Sales, is charged with selling and ensuring production, distribution and world wide delivery of products from Debtor's inventory of raw materials and finished product. His regular compensation is a combination of base pay and a commission based upon achieving sales in excess of predetermined goals. His duties with Tripath

---

[2] The Secured Parties' consent to the relief sought herein shall not operate as a waiver of any of the Secured Parties' rights, claims, or defenses with respect to any proceeding, pending or to be subsequently commenced, involving any of the Debtor's current or former officers and/or directors, all of which rights have been expressly reserved.

MOTION FOR ORDER APPROVING
PERFORMANCE-BASED BONUS -3-
99999-8613/LEGAL13151065.1

included forecasting and achieving short and long-range sales targets, providing leadership, sales structure and the parameters by which to efficiently get products to market, managing new product development, pricing and introduction, managing the client acquisition process, and creating vision and plans for the migration of the sales model to meet the ever changing needs of the marketplace. He developed and managed sales and marketing plans and corresponding fiscal budgets, and he provided ongoing analysis and recommendations for pricing and distribution. Despite the layoff of personnel in January, the bankruptcy filing on February 8 and the subsequent move to new offices, he managed to achieve Tripath's sales revenue and collection objectives for the first quarter of 2007.

11. Mr. Thairani's business relationships, his industry knowledge and his expertise are critical to the success of ongoing product Sales. He also assists in the Auction effort by meeting with prospective bidders to help "sell" the value of Tripath's IP, products and assets, and his intimate knowledge of products, markets, customers and competition helps demonstrate the value and potential of the company.

12. Dr. Naresh Sharma is the Vice-President of Operations, with over 20 years of experience in the semiconductor industry, and expertise in "productization," engineering and strategic operations. He received an M.S. in Solid State Physics from Roorkee Engineering University in India in 1974 and a Ph.D. in Physics from Indian Institute of Technology, New Delhi in 1978. Prior to joining Tripath, Dr. Sharma held various senior management and engineering positions at Cirrus Logic, Alliance Semiconductor, Cypress Semiconductor, National (Fairchild) Semiconductor and American Microsystems. He joined Tripath in 1998 and served as Director of Process Engineering and Development before being named VP of Operations. Under the Budget required by the Secured Parties and filed with the Court, Dr. Sharma's salary was reduced by 50% as of February 15, 2007, from $6,250 per bi-weekly pay period to $3,125.

13. Dr. Sharma has been responsible for all manufacturing of products at Tripath, ensuring proper and timely build and shipment of products from vendors while overseeing product quality and reliability, monitoring yield and failure analysis, and providing technical support for all products. Dr. Sharma is the technical resource for responses to specific requests

and questions from potential buyers regarding Tripath's products and he oversees demonstrations of the design database to the buyers, working with them to assess the portability potential of the data bases to their own manufacturing sites. He has conducted successful live demonstrations of Tripath's design cell library for potential bidders, including design rule checker programs, layout versus schematic correlation, and simulation results. Dr. Sharma has the technical expertise to relate the relevance and synergy of Tripath's assets to the bidders' business needs, and his technical knowledge and expertise may be the key to the success of the Auction.

14. Together, Mr. Thairani and Dr. Sharma are working on Sales that would need to be completed prior to the Auction as well as the ongoing process of providing technical, financial and marketing information as potential bidders conduct their due diligence. Without the sustained effort and support of Dr. Sharma and Mr. Thairani, the Debtor risks falling short of the potential value that could otherwise be achieved for the estate and its creditors.

15. Mr. Thairani's ability to secure ongoing sales of Tripath's products while the Debtor is in the throes of bankruptcy is critical to its ability to operate as a debtor in possession. Due primarily to his efforts, the Debtor operates on cash collateral, without the need of any post-petition borrowing or "DIP Financing." However, as the time for the Auction approaches, it will become more difficult to convince buyers that delivery can be made before the Auction and that production plans can be made in reliance on such deliveries. However, Mr. Thairani may be out of a job within a few days after the Auction and it is only fair to provide an incentive to keep him focused on Tripath Sales instead of looking for a new job.

16. The Amended Operating Budget (the "Budget") approved with the Final Order Pursuant to §§105, 361 and 363 and Fed. R. Bankr. P. 4001 Authorizing Debtor's Use of Secured Parties Cash Collateral and Providing Adequate Protection to Secured Parties (the "Final Cash Collateral Order") projects gross sales of $1,040,000 between the Petition Date and May 15, 2007, the projected closing date of the sale arising out of the Auction. If the Debtor is able to adhere to the Budget, Mr. Thairani's sales will generate a net profit of $48,000 after all operating expenses and reorganization expenses. To the extent Mr. Thairani is able to generate Sales (and profits) in excess of the Budget, he should be rewarded for his efforts.

17.     The Debtor's assets are encumbered by secured obligations due to Enable Growth Partners, LC ("Agent"), individually and as agent for the 6% Senior Secured Debentures, under the original issue date November 8, 2005 (the "Debentures") of the Debtor in favor of Bushido Capital Master Fund, LP, Enable Growth Partners, LP, Enable Opportunity Partners, LP, Gamma Opportunity Capital Partners, LP Class A, Gamma Opportunity Capital Partners, LP Class C, Gryphon Master Fund, L.P., GSSF Master Fund, L.P.), and SRG Capital, LLC (collectively with the Agent, the "Secured Parties") pursuant to a security agreement, dated November 8, 2005 (the "Security Agreement").

18.     Enable, on behalf of itself and the other Secured Parties, has filed a proof of claim seeking $4,857,666.46, including default interest through January 31, 2007, but not including other interest, fees and costs to which Enable claims entitlement. Enable has also represented to the Court that it believes the value of the Tripath assets exceeds the amount of its secured claim. The Debtor does not dispute that it is in default under the terms of the Debentures and that it has been in default since at least October 6, 2006; its books and records reflect that the principal balance due to the Secured Parties as of October 1, 2006 was $3,500,000. Counsel for the U.S. Trustee has informally questioned Enable's entitlement to certain penalties and default interest, but no formal objection has been filed with respect to Enable's claim.

19.     To the best of Debtor's knowledge, there are no other creditors claiming a security interest in or lien on the Assets. To the extent Dr. Sharma is able to help produce Auction proceeds that exceed the amount of the Secured Parties' claim, the excess will accrue to the benefit of unsecured creditors and Dr. Sharma should be rewarded for his efforts. Moreover, like Mr. Thairani, Dr. Sharma may be out of a job and unemployed shortly after closing of the transaction, and his focus on the success of the Auction should not go unrewarded.

20.     In addition to Mr. Thairani and Dr. Sharma, the Debtor has seven other employees, each of whom is important to the continued operation of the Debtor's business in their own way, and all of whom is almost certain to be unemployed within a short while after the Auction. In addition to offering incentives to Mr. Thairani and Dr. Sharma, Debtor seeks authorization to

MOTION FOR ORDER APPROVING
PERFORMANCE-BASED BONUS            -6-
99999-8613/LEGAL13151065.4
Case: 07-50358    Doc# 128    Filed: 04/19/07    Entered: 04/19/07 15:58:26    Page 6 of 11

allow these employees to share in the success of Sales above Budget and in Auction proceeds that exceed the Secured Parties' allowed claim.

21. Specifically, Debtor proposes to allocate the bonuses as follows. With respect only to Sales *in excess of* Budget, the Debtor proposes to set aside fifteen percent (15%) of the cash gross profit, calculated as sale price less post-petition production and delivery costs.[3] Because the Sales results will result largely from the efforts of Mr. Thairani and to a lesser extent on Dr. Sharma, the Sales incentive pool would be allocated 50% to Mr. Thairani, 25% to Dr. Sharma, and 25% to the other employees on a pro rata basis.

22. With respect to Auction proceeds in excess of the Secured Parties' allowed claim, the debtor proposes to set aside five percent (5%) of the sale proceeds in excess of the Secured Parties' allowed claim to be allocated among the employees. Because the Dr. Sharma's efforts will be primarily aimed at increasing the Auction results, with specific support from Mr. Thairani, these funds, if any, would be allocated 50% to Dr. Sharma, 25% to Mr. Thairani, and 25% to the other employees on a pro rata basis.

23. For example, if the Auction price were $5 million and the Secured Parties' claim were allowed at $4.8 million, the incentive pool set-aside would be $10,000 (5% x $200,000). If the Auction proceeds were $6 million and the Secured Parties' allowed claim was $4.8 million, five percent of $1.2 million ($60,000) would be set aside for the performance incentive pool. Debtor's amended schedules list unsecured (priority and nonpriority) claims totaling approximately $3.25 million; under the latter example, allowing for payment of priority unsecured claims to the limits of their priority, general unsecured creditors would receive estimated distributions of approximately 29%, after payment of the incentive. Without the incentive, general unsecured creditors would fare only slightly better, approximately 31%.

24. An employee who voluntarily terminated his or her employment at Tripath before May 15, 2007 would not share in either incentive; any such employee's share would be allocated among the remaining employees (not including Mr. Thairani or Dr. Sharma).

---

[3] Cash gross profit is the gross revenue less the out-of-pocket post-petition payments to suppliers. It is Debtor's belief that the existing die bank inventory will be of little value if it is not marketing heavily as technology changes will soon make this inventory obsolete.

**Basis for Relief Requested**

25. Bankruptcy Code Section 363(b)(1) provides that "the trustee [or debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." This provision generally allows debtors-in-possession to engage in post-petition transactions outside of the ordinary course of business upon a showing of sound business judgment. <u>Committee of Equity Security Holders v. Lionel Corporation (In re Lionel Corp.)</u>, 722 F.2d 1063, 1070 (2d Cir. 1983); <u>In re Ernst Home Center, Inc.</u>, 209 B.R. 974, 980 (Bankr. W.D. Wash. 1997). When a debtor articulates a reasonable basis for its business decisions, "courts will generally not entertain objections to the debtor's conduct." <u>Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

26. Debtor has determined in its business judgment that payment of the proposed compensation is in the best interests of Debtors' estates. Debtor believes that by providing a direct incentive based upon increased Sales, the potential return to the estates will be maximized. The estates will not be burdened because any additional compensation due as a result of above-Budget Sales or higher Auction prices will be paid from the increases.

27. The proposed compensation was negotiated at some length between Mr. Thairani, Dr. Sharma and Gary Sawka, acting CFO and the designated Responsible Individual for Tripath. The end result is a fair balance, maximizing the net recoveries to the estate while providing reasonable incentives to the employees to forego looking for other job opportunities and focus instead on maximizing Sales and Auction proceeds.

28. The relatively small amount contemplated to be paid is believed to be substantially less than the estate would have to pay to locate and hire trained professionals for the same kind of work if Mr. Thairani or Dr. Sharma should leave. Moreover, the length of time necessary to recruit, hire and train the appropriate professionals would more than likely consume all of the time remaining before the Auction. Finally, the ultimate cost of the Auction incentive (approximately 2%) to the real parties in interest, the general unsecured creditors, is minimal in comparison with the potential benefits.

29. Debtor notes that as part of the 2005 amendments to the Bankruptcy Code, Section 503(c) was added, which disallows as an administrative expense certain retention bonuses and severance payments to insiders unless specific requirements are met. 11 U.S.C. § 503(c)(1) and (2). Neither Mr. Thairani nor any of the seven remaining employees is a corporate officer or an insider; thus, the provisions of §503(c) are not applicable to Mr. Thairani or any of the other employees.

30. Although Dr. Sharma is a corporate officer, and thus an "insider" for purposes of the Bankruptcy Code, all of the proposed bonuses are incentive compensation, based on formulas directly tied to success in marketing the Debtor's products and its assets. None of the proposed incentive payments constitute "stay" bonuses or payments for merely staying with the Debtor until a certain date. The provisions of §§503(c)(1) and (c)(2) are therefore not applicable to Dr. Sharma.

31. Due to its recent enactment as part of the 2005 amendments, only a handful of reported decisions address Section 503(c)(3). The few cases dealing with that section make it clear, however, that Section 503(c)(3) does not alter existing law. As stated recently by the Bankruptcy Court for the Southern District of New York in the leading case in this area, Section 503(c)(3) is "nothing more than a reiteration of the standard under 363 under which courts had previously authorized transfers outside the ordinary course of business based on the business judgment of the debtor." In re Dana Corporation, --- B.R. ---, 2006 WL 3479406 (Bankr. S.D.N.Y. 2006) (citing In re Nobex Corp., 2006 WL 4063024 (Bankr.D.Del. 2006)). Nor does Section 503(c)(3) impose any greater standard than exists with respect to other administrative expense claims. 4 COLLIER ON BANKRUPTCY ¶ 503.17[3] (15th ed., rev. 2006) (503(c)(3) is no more stringent than the one courts must apply in approving administrative expenses under section 503(b)(1): the expenses must be "actual, necessary costs and expenses of preserving the estate.")

32. Therefore, in approving the proposed incentive compensation, the Court need not depart from the familiar standards for authorizing use of estate property or allowing an administrative expense claim. Indeed, when evaluating a Debtors' proposed compensation plan under Section 503(c)(3), the Dana Court relied upon pre-2005 amendment case law. Dana, ---

B.R. ---, 2006 WL 3479406 at 6.  In doing so, that Court considered the following factors in determining that the compensation plan at issue there satisfied the "sound business judgment" test:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance?* (emphasis added)

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

Dana, --- B.R. ---, 2006 WL 3479406 at 6.

33. To the extent applicable, each of the above factors favors approval of the proposed incentives.  First, both proposals are designed to achieve the desired results:  with percentage compensation, the employees will receive bonuses only upon the occurrence of Sale and Auction proceeds in excess of certain targets.  Moreover, percentage compensation, by definition, will only be a small fraction of the actual value achieved on behalf of the estate.  Second, the amount of compensation is fair and reasonable in relation to the context of Debtor's assets and liabilities and is consistent with industry standards.  Third, the plan would apply to all employees, and does not discriminate unfairly.  Fourth, the Debtor's representative who negotiated the proposed bonus plan will not participate in or receive any portion of the proposed incentives.  Therefore, the proposal is not hampered by any tinge of self-interest. .

## Conclusion

Nothing in § 503(c) or anywhere else in the Bankruptcy Code should affect a debtor's ability to pay reasonable compensation. Because eight of the nine employees sought to be compensated are not "insiders" as defined in the Bankruptcy Code, and because the proposed incentive compensation is based solely on quantifiable performance results and not on continued employment, §§ 503(c)(1) and (2) are inapplicable. In any event, were the 2005 amendments to be deemed applicable to Dr. Sharma, for the reasons set forth above the proposed compensation is fully "justified by the facts and circumstances of the case" for purposes of 11 U.S.C. § 503(c)(3). For the foregoing reasons, the Debtor respectfully requests the Court to issue an order approving payment of performance based bonuses as provided above.

DATED: April 19, 2007

/s/      Bruce G. MacIntyre
Bruce G. MacIntyre, WA Bar No. 18984
BMacIntyre@perkinscoie.com
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
*Pro hac vice*

Ed Wes, CA Bar No. 180252
EWes@perkinscoie.com
Gabriel Liao, CA Bar No. 205897
GLiao@perkinscoie.com
**Perkins Coie LLP**
101 Jefferson Drive
Menlo Park, CA 94025-1114
Telephone: 650.838.4300
Facsimile: 650.838.4350

Attorneys for Debtor and
Debtor-in-Possession,
Tripath Technology, Inc.